## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X

DIVISION 5, LLC,

Civ. A. No. 1:24-cv-06870

Plaintiff,

-vs-                                              **JURY TRIAL DEMANDED**

FORA FINANCIAL ADVANCE LLC,

Defendant.

--------------------------------------------------------------------X

## **COMPLAINT**

Plaintiff, DIVISION 5, LLC, as and for its Complaint against Defendant FORA

FINANCIAL ADVANCE LLC, states as follows:

## **NATURE OF THE ACTION**

1.        This is an action against a merchant cash advance ("MCA") company that carries

out fraudulent schemes to collect upon unlawful debts and otherwise fraudulently obtain funds

from companies like plaintiff (and hundreds of other similarly situated victims) through the use

of their sham MCA agreements as further defined below ("MCA agreements").

2.        Unfortunately, the type of conduct by Defendant here is a ballooning national

problem that has raised the attention of both state and federal regulators.

3.        Plaintiff here is a victim of Defendant's unlawful lending practices.

4.        Plaintiff DIVISION 5, LLC, is a minority-owned, Veteran-certified structural

steel and miscellaneous metals fabrications and installation business in Connecticut.

5.        In early 2023, Jeffrey Dweck, Defendant's agent and/or partner, began soliciting

Plaintiff to obtain a small business "loan" with Defendant.

6.        After several unsolicited communications from Dweck, Plaintiff ultimately agreed

to obtain a loan from Defendant to help meet its payroll costs and other expenses while awaiting

payment from Plaintiff's customers.

7.      Defendant used terms such as "loan," "interest rate," and "term," words that would be used with any conventional loan.

8.      On or about June 29, 2023, DIVISION 5 entered into a Merchant Cash Agreement with Defendant (the "MCA Agreement").

9.      Under the MCA Agreement, Defendant funded the sum of $354,200.00 to DIVISION 5 (the "Loan").

10.     Plaintiff's principal, CONRAD BARKER, was forced to enter into a personal guarantee under the agreement.

11.     Defendant actually in fact only disbursed $343,574.00, claiming that there was a nonrefundable $10,626 "processing fee" for the Loan.

12.     Then, Plaintiff was somehow supposed to pay back the sum of $502,964.00 by Defendants pulling $8,112.33 out of Plaintiff's bank account every week.

13.     In other words, even using the funded amount instead of the actual amount disbursed, Defendant was going to receive $148,764.00 in interest on a $354,200.00 loan (42%) in only 62 weeks.

14.     This is an effective annual interest rate of more than 35%.

15.     The maximum interest rate permitted under the laws of New York, however, is 16% civilly and 25% criminally.

## **THE PARTIES**

16.     Plaintiff DIVISION 5, LLC is a Connecticut limited liability company with its principal place of business located in Stafford Springs, CT.

17.     Plaintiff has two members, both of whom are citizens of Connecticut.

18.     Defendant FORA FINANCIAL ADVANCE LLC is a domestic limited liability company with its principal place of business located in New York, NY.

19.     Upon information and belief, Defendant has no members who are citizens of Connecticut.

## JURISDICTION

20.     Defendant is subject to the personal jurisdiction of this Court because Defendant is a domestic company headquartered in New York, Defendant regularly transacts business within the State of New York, Defendant has purposefully availed itself of the laws of New York for the specific transactions at issue by soliciting, targeting, and effectuating the wire activity complained of herein from New York, and Defendant set New York as the venue for any disputes in its MCA Agreement.

21.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a)(1) as Plaintiff is a Connecticut citizen while Defendant is a New York citizen, and the matter in controversy is in excess of $75,000.00.

22.     Venue is proper because Defendant is headquartered in the Southern District of New York and Defendant regularly conduct business within this judicial district.

## COMMON FACTUAL ALLEGATIONS

### A.     The Predatory MCA Industry.

23.     The MCA Industry spawned from the 2008 Financial Crisis. One of the earliest MCA companies, Yellowstone Capital LLC, was co-founded in 2009 by David Glass, an inspirational character for the movie "Boiler Room."[1] As Mr. Glass confessed to Bloomberg News, "it's a lot easier to persuade someone to take money than to spend it buying stock." Just

---

[1] https://www.sec.gov/litigation/admin/2008/34-58574.pdf

like in the movie, MCA companies utilize high-pressure boiler room tactics, employing salespersons with absolutely no financial background whatsoever.

24.    As Bloomberg previously reported, the MCA Industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[2] The MCA Industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy." *Id.* As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage. There's no license you need to file for. It's pretty much unregulated." *Id.*

**B.    The Sham.**

25.    Many states, like New York, have laws prohibiting predatory interest rates. In order to evade these civil and criminal usury laws, MCA companies disguise their agreements as "purchases of future receivables." MCA companies promote a fiction that, rather than making loans to merchants, they are purchasing, at a discount, a fixed amount of the merchant's future receivables, usually to be repaid through a fixed daily or weekly payment that purportedly represents a percentage of the merchant's receipts. The form of the contract thus allows MCAs to represent to courts that they, not the merchants, assume the risk that the merchants will fail to generate receivables. But the picture they paint is contrary to reality. By operation of their agreements' default rights and remedies, the MCA companies exert complete control over the relationship and compel their merchants to make the fixed payments or suffer the consequences.

**C.    The Bloomberg Awakening.**

26.    For nearly a decade, MCAs operated under the radar of regulators, compiling over 25,000 confessions of judgment against small businesses and their individual owners. That all

---

[2] https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans

changed on November 20, 2018 when Bloomberg News published what would be the first in a series of groundbreaking news articles exposing the abuses of the predatory MCA industry.[3]

27.    As a direct result of the light shined on these abuses, the New York Legislature quickly enacted legislation extinguishing their weapon of mass destruction, the confession of judgment, expressly citing the Bloomberg articles as its inspiration.

28.    Congress also took notice. On June 26, 2019, the United States House of Representatives held a hearing titled: "Crushed by Confessions of Judgment: the Small Business Story." As explained by Professor Hosea Harvey, a contracts expert from Temple University, small businesses are just as susceptible to predatory lending as unsophisticated individuals.[4]

29.    Regulators have also taken action. On July 31, 2020, the New York Attorney General brought suit against a group of MCA companies, as well as their principals, alleging that their MCA agreements constitute criminally usurious loans.[5]  Just a few months ago, this action resulted in a judgment against these MCA companies and their principals totaling more than $77 million dollars for usury and fraud due to illegally high-interest, short-term loans and undisclosed fees disguised as merchant cash advances, which followed a ruling in September 2023 that included the cancellation of all outstanding debts of the small businesses involved.[6]

30.    On July 31, 2020, the Securities and Exchange Commission shut down an MCA company named Par Funding. In its complaint, the SEC alleged that Par Funding "made opportunistic loans, some of which charged more than 400% interest, to small businesses across America."[7] The FBI thereafter raided its offices, confiscating a cache of guns, millions of dollars

---

[3] https://www.yahoo.com/entertainment/merchant-cash-advances-salvation-small-businesses-payday-lending-reincarnate-161835117.html
[4] https://www.congress.gov/event/116th-congress/house-event/LC64251/text?s=1&r=60
[5] https://ag.ny.gov/press-release/2020/attorney-general-james-sues-predatory-lender-threatened-violence-and-kidnapping
[6] https://ag.ny.gov/press-release/2024/attorney-general-james-announces-historic-judgment-against-predatory-lender
[7] https://www.sec.gov/litigation/litreleases/2020/lr24860.htm

in cash, and a private airplane.[8]

31.     On June 10, 2020, the Federal Trade Commission filed a complaint against Jonathan Braun and his various companies alleging various fraudulent and deceptive practices in connection with MCAs.[9]  Just a few months ago, this resulted in a judgment of more than $20 million dollars, which followed an October 2023 permanent injunction ruling.[10]

32.     On August 3, 2020, the Federal Trade Commission filed a complaint against Yellowstone Capital.[11] Notably, the FTC complained that Yellowstone "unlawfully withdrew millions of dollars in excess payments from their customers' accounts, and to the extent they provided refunds, sometimes took weeks or even months to provide them." *Id.*  This resulted in a $9.8 million settlement by the MCA company.[12]

33.     On November 10, 2020, the California Commission of Financial Protection and Innovation entered into a Consent Order with Allup Financial LLC, finding that its MCA agreements were lending transactions subject to the California Finance Lenders Law, and barring the MCA company from doing business in California unless and until it complies with its laws.[13]

34.     On December 8, 2020, the New Jersey Attorney General also filed suit against Yellowstone, alleging it cheated "financially-strapped small businesses and their owners out of millions of dollars nationwide by luring them into predatory loans disguised as cash advances on future receivables with interest rates far exceeding the interest rate caps in the State's usury

---

[8] https://www.inquirer.com/news/par-funding-better-financial-plan-joseph-laforte-dean-vagnozzi-20200731.html
[9] https://www.ftc.gov/system/files/documents/cases/192_3252_rcg_advances_-_complaint.pdf
[10] https://www.ftc.gov/news-events/news/press-releases/2024/02/court-enters-203-million-judgment-ftc-case-against-merchant-cash-advance-operator-jonathan-braun
[11] https://www.ftc.gov/news-events/press-releases/2020/08/ftc-alleges-merchant-cash-advance-provider-overcharged-small
[12] https://www.ftc.gov/legal-library/browse/cases-proceedings/182-3202-yellowstone-capital-llc-ftc-v
[13] https://dfpi.ca.gov/wp-content/uploads/sites/337/2020/11/Consent-Order-Allup-Finance-LLC.pdf

laws."[14]  This resulted in a $27.4 million dollar settlement by the MCA company.[15]

35.    On December 23, 2020, New York signed into law the Small Business Truth in Lending Law, which is aimed at "protecting small business owners," and "requires key financial terms such as the amount financed, fees and annual percentage rate (APR) to be disclosed at the time a credit provider or broker makes an offer of financing of $500,000 or less."[16]

36.    As NBC News recently reported, however, the financial greed of predatory lenders, like Defendants, has only accelerated in the wake of Covid-19.[17]

**D.    The Sea Change in Law.**

37.    Prior to the Bloomberg Awakening, courts routinely rejected attempts by small business victims seeking to vacate the many thousands of confessions of judgments filed by MCA companies. Courts primarily denied those attempts on the procedural basis that a plenary action must be filed instead of merely seeking to vacate by motion. One court went so far as to sanction the attorney for even bringing the motion. *See, e.g., Yellowstone Capital LLC v. Central USA Wireless LLC*, 2018 N.Y. Misc. LEXIS 2516, *2 (N.Y. Sup. Ct., Erie Cty Jun. 25, 2018) (citing *Yellowstone Capital, LLC v. Jevin*, Index No. 802457/2017 (N.Y. Sup. Ct. Erie Co. Oct. 6, 2017)).

38.    The tide has since turned in the wake of the Bloomberg articles. Most notable is the decision by Judge Nowak, a Commercial Division Justice out of Erie County—a favorite forum for MCAs given Upstate New York's more conservative political leanings. *See McNider*

---

[14] https://www.njoag.gov/ag-grewal-files-suit-against-yellowstone-capital-llc-and-associated-companies-alleging-the-merchant-cash-advance-companies-targeted-small-businesses-with-predatory-lending-and-abusive-collection-pract/
[15] https://www.njoag.gov/ag-platkin-announces-27-375-million-settlement-with-yellowstone-capital-llc-and-related-entities-over-allegations-of-unlawful-lending-servicing-and-collection-practices/
[16] https://www.jdsupra.com/legalnews/gov-cuomo-signs-new-york-small-business-9450503/
[17] https://www.nbcnews.com/business/economy/feds-crack-down-lenders-targeting-small-businesses-high-interest-loans-n1236167

*Mar., LLC v Yellowstone Capital, LLC*, 2019 N.Y. Misc. LEXIS 6165 (N.Y. Sup. Ct., Erie Cty

Nov. 19, 2019). Notably, Judge Nowak reversed his own prior decision in *Yellowstone Capital,*

*LLC v. Jevin*, *supra*, where he previously held that the very same Yellowstone agreement was

not a loan as a matter of law. This time, upon further reflection, Judge Nowak not only upheld

the claims of usury, but also upheld the RICO claims. Numerous courts have followed suit. *See,*

*e.g., Davis v. Richmond Capital Group*, 194 A.D.3d 516 (1st Dept. 2021); *NRO Boston LLC v.*

*Yellowstone Capital LLC*, 2021 N.Y. Misc. LEXIS 1892 (Rockland Cty, April 9, 2021)

(upholding RICO claims); *LG Funding LLC v. United Senior Properties of Olathe LLC,* 122

N.Y.S.3d 309 (2d Dep't. 2020); *American Resources Corp. v. C6 Capital, LLC*, 2020 N.Y. Misc.

LEXIS 10725, *6 (N.Y. Sup. Ct., Kings Cty. Dec. 16, 2020); *Funding Metrics LLC v. NRO*

*Boston*, 2019 N.Y. Misc. LEXIS 4878 (N.Y. Sup. Westch. Cty. Aug. 28, 2019); *Funding*

*Metrics, LLC v. D & V Hospitality*, 62 Misc.3d 966 (N.Y. Sup. Westch. Cty. Jan. 7, 2019), *rev'd*

*on other grounds.*

      39.    Numerous federal courts have also joined the revolution. *See Lateral Recovery*

*LLC v. Queen Funding LLC*, Case No. 21-civ-9607 22, 2022 U.S. Dist. 129032 (S.D.N.Y. July

20, 2022) (upholding RICO claims under MCA agreement); *Fleetwood Servs. LLC v. Ram*

*Capital Funding, LLC*, Case No. 20-cv-5120 (LJL), 2022 U.S. Dist. LEXIS 100837 at *32

(S.D.N.Y. June 6, 2022) (applying risk-transfer analysis to an MCA agreement to conclude

agreement was a criminally usurious loan in granting summary judgment on merchant's unlawful

debt RICO collection claims); *Haymount Urgent Care PC v. GoFund Advance, LLC*, 22-cv-1245

(JSR), 2022 WL 2297768, *16 (S.D.N.Y. June 27, 2022) (same); *Fleetwood Servs., LLC v.*

*Complete Bus. Sols. Grp.*, 374 F.Supp.3d 361 (E.D. Pa. 2019) (same); *NRO Boston v. Funding*

*Metrics*, 2018 U.S. Dist. LEXIS 239152 (E.D. Pa. May 23, 2018) (same); *Davis v. Richmond*

*Capital Group*, 194 A.D.3d 516 (1st Dept. 2021); *NRO Boston LLC v. Yellowstone Capital LLC*,

2021 N.Y. Misc. LEXIS 1892 (Rockland Cty, April 9, 2021) (upholding RICO claims).

40.    So has New York's highest court. Most notably, a member of New York's highest

court, just recently advised in *dicta* that MCA transactions, like here, more closely resemble

loans subject to New York's usury laws rather than bona fide sales of receivables:

> Although the GTR and CMS agreements are described as 'factoring' agreements,
> they do not bear several of the hallmarks of traditional factoring arrangements, in
> that FutureNet did not sell any identifiable receivable to GTR or CMS; GTR and
> CMS did not collect any receivables; GTR and CMS received fixed daily
> withdrawals from FutureNet's bank account regardless of whether or how much
> FutureNet collected from or billed to its clients; and GTR and CMS did not bear
> the risk of nonpayment by any specific customer of FutureNet. The arrangements
> FutureNet entered with GTR and CMS appear less like factoring agreements and
> more like high- interest loans that might trigger usury concerns (*see Adar Bays,
> LLC v GeneSYS ID*, NE3d, 2021 NY Slip Op 05616 [2021]). Nevertheless, for the
> purpose of these certified questions, we are asked to assume the judgments rendered
> on those agreements are valid.

*Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 2021 N.Y. LEXIS 2577, *45, 2021 NY

Slip Op 07055, 11, 2021 WL 5926893 (N.Y. Dec. 16, 2021).

### E.    The MCA Agreement is Substantively and Procedurally Unconscionable.

41.    The MCA Agreement is an unconscionable contract of adhesion that is not

negotiated at arms-length.

42.    Instead, the MCA Agreement contains one-sided terms that prey upon the

desperation of the small business and their individual owners and help conceal the fact that each

of the transactions, including those involving the Plaintiffs, are really loans.

43.    Among these one-sided terms, the MCA Agreement includes: (1) a provision

giving the MCA company the irrevocable right to withdraw money directly from the merchant's

bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a

provision preventing the merchant from transferring, (3) moving or selling the business or any

assets without permission from the MCA company, (4) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (5) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition of obtaining financing from other sources, (11) the maintenance of business interruption insurance, (12) an assignment of lease of merchant's premises in favor of the MCA company, (13) the right to direct all credit card processing payments to the MCA company, (14) a power-of-attorney to settle all obligations due to the MCA Company and (15) a power of attorney authorizing the MCA company to "file any claims or taken any action or institute any proceeding…"

44.     The MCA Agreement is also unconscionable because it contains numerous knowingly false statements. Among these knowingly false statements are that: (1) the transaction is not a loan, (2) the fixed daily or weekly payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily or weekly payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring the MCA company to charge an exorbitant ACH Program Fee or Origination Fee.

45.     The MCA Agreement is also unconscionable because it is designed to fail. Among other things, the MCA Agreement is designed to result in a default in the event that the merchant's business suffers any downturn in sales by preventing the merchant from obtaining other financing and requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant.

46.     The MCA Agreement also contains numerous improper penalties that violate New York's strong public policy. Among these improper penalties, the MCA Agreement (1) entitles the MCA company to attorneys' fees, (2) accelerates the entire debt upon an Event of Default, and (3) requires the merchant to turn over 100% of all of its receivables if it misses just one or a few fixed payments.

47.     As described below, as it relates to Plaintiff's account, Defendant did not legitimately reconcile the account, adjusting the account based on past, rather than expected future performance, and then ultimately abandoning and refusing to reconcile altogether.

**F.   The Enterprise Intentionally Disguises the True Nature of the Transactions.**

48.     Despite the documented form, MCA transactions are, in economic reality, loans that are absolutely repayable. Among other hallmarks of a loan:

(a)     The Daily/Weekly Payments are fixed and the so-called reconciliation provision are mere subterfuge to avoid usury laws. Rather, just like any other loan, the Purchased Amount is to be repaid within a specified time;

(b)     The default and remedy provisions purport to hold the merchants absolutely liable for repayment of the Purchased Amount. The loans seek to obligate the merchants to ensure sufficient funds are maintained in the Account to make the Daily/Weekly Payments and, after a certain number of instances of insufficient funds being maintained in the Account, the merchants are in default and, upon default, the outstanding balance of the Purchased Amount becomes immediately due and owing;

(c)     While the agreements purport to "assign" all of the merchant's future account receivables to the Enterprise until the Purchased Amount is paid, the merchants retain all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof. Indeed, rather than purchasing receivables, the Enterprise merely acquires a security interest in the merchant's accounts to secure payment of the Purchased Amount;

(d)     The transactions are underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e)     The Purchased Amount is not calculated based upon the fair market value of the merchant's future receivables, but rather is unilaterally dictated by the

Enterprise based upon the interest rate it wants to be paid. Indeed, as part of the underwriting process, the Enterprise does not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(f)    The amount of the Daily Payments is determined based upon when the Enterprise wants to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g)    The Enterprise assumes no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constitutes a default under the agreements;

(h)    The Enterprise requires that the merchants undertake certain affirmative obligations and make certain representations and warranties that are aimed at ensuring the company will continue to operate and generate receivables and a breach of such obligations, representations and warranties constitutes a default, which fully protects the Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables.

(i)    The Enterprise requires that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew would be breached from day one.

## FACTS SPECIFIC TO PLAINTIFF

### A.    The Loan

49.    Plaintiff DIVISION 5, LLC is a minority-owned and Veteran-certified business that specializes in structural steel and miscellaneous metals fabrications and installation for general contractors and construction managers.  DIVISION 5 has been in business for 11 years and is based out of Connecticut.

50.    Conrad Barker is the majority member and principal of DIVISION 5.

51.    Defendant and its agents and associates prey upon cash-strapped businesses that cannot readily obtain financing from banks and other traditional lenders. Toward that end, Defendant markets, underwrites and collects upon its loans, which are disguised as MCA transactions with interest rates far above those permissible under New York Law, both civil and

criminal.

52.    In April 2023, Plaintiff began receiving unsolicited emails from Victor Dweck, a gentleman who is either an agent or partner of Defendant, wanting to speak with Plaintiff about providing a small business loan.

53.    In his email, Dweck stated that when his company loans, they never file UCC liens against the business.

54.    Plaintiff did not respond, and Dweck followed up again in June 2023.

55.    After the second outreach, Plaintiff responded to Dweck's email and Barker and Dweck spoke via phone at the number Dweck provided.

56.    During their conversation, Barker told Dweck that it was a slow pay period for the company as Plaintiff's customers only had to pay at a minimum of net 30 days, while its employees and vendors obviously had to be paid immediately.

57.    Dweck stated that he could definitely assist with that, because he worked with a number of private lenders for precisely this type of situation.

58.    Barker filled out the documentation that Dweck sent him and provided all requested documents, and Dweck informed Barker that Plaintiff was approved for a $350,000 loan with a term of 15½ months, and that he would be receiving a call from Defendant.

59.    Defendant thereafter called Barker, and sent him a contract to sign.

60.    Barker was told by Defendant that Plaintiff would be receiving a loan of $354,200 with a payback of 12% of the principal, and that Plaintiff would have to make initial weekly payments of $8,112.33.

61.    Defendant did not give Plaintiff the opportunity to review the contract or have it reviewed with an attorney.

62.    Rather, Defendant stayed on the phone with Barker and just told me to click in all of the DocuSign boxes in which he needed to click.

63.    On the basis of these statements that had been made to Plaintiff by Dweck and Defendant, Plaintiff agreed to enter into the contract.

64.    Thus, Plaintiff and Defendant entered into an MCA Agreement on June 29, 2023.

65.    At all times both parties understood this transaction to be a loan, and the MCA Agreement even referred to the "Loan Disbursement Amount."

66.    However, Defendant, knowing that such a loan was criminally usurious and unenforceable, instead couched the loan in a "merchant cash advance's" clothing.

67.    On its face, the agreement provided Plaintiff with an advance of $354,200.00 ("Purchase Price") in exchange for the purported purchase of all of Plaintiff's future receipts (the "Future Receipts") until such time as the amount of $502,964.00 (the "Purchased Amount") was repaid.

68.    However, in fact, Defendant only sent $343,574.00, claiming that there was a nonrefundable $10,626 "processing fee" for the Loan, even though Defendant had little to no actual processing costs.[18]

69.    Additionally, on its face, the agreement provided that the Purchased Amount was to be repaid through weekly ACH withdrawal in the amount of $8,112.33 (a "Weekly

---

[18] The New York Court of Appeals in Adar Bays, LLC v. GeneSys ID, Inc., 37 NY3d 320, 337 (2021) instructed that criminal usury analysis requires "strict attention to additional fees exacted sometimes creatively through loan instruments" and that New York law requires that all consideration to be paid in exchange for a loan should be valued when determining if a transaction is usurious; where the object of the parties is a loan of money, and something else under the form of an exchange or sale is substituted for it, the principle of the loan, and consequently of the debt contracted by the nominal vendee, will be the value in money of the substitute received by him; and any consideration paid or secured to the vendor beyond that will in general be considered as interest for its forbearance. Thus, these alleged upfront fees charged or other costs imposed were clearly additional interest profit on what was in actuality a $343,574.00 loan, and as such, are properly considered interest and not principal.  However, regardless of whether these fees are deemed interest or principal, the analysis as to the usurious nature of this agreement does not change.

Payment"), which would result in the amount being repaid in just 62 weeks which, on its face, translates to an annual interest rate of more than 35% per annum, or 10% more than the maximum 25% rate permitted under New York's criminal law.

70.    The fixed weekly payment was disguised as an alleged "good-faith estimate" equal to 12% of Plaintiff's weekly revenues.

71.    The estimated weekly payment did not remotely reflect 12% of Plaintiff's weekly revenues.

72.    Rather, the estimated weekly amount was dictated by Defendant based on Defendant's desired length of the payment "term" of the loan. i.e. 62 weeks.

73.    At the time, Plaintiff did not realize what this number meant or that the repayment amount was more than 12%, as Plaintiff was told that the interest would be 12% and saw the 12% number reflected on the face of the agreement and assumed the numbers were accurately calculated, as Plaintiff was being rushed through the document by Defendant on the phone.

74.    Additionally, similar to what might be required in a loan, and completely inappropriate for a "sale of future receivables," Defendant also required Barker to execute a personal guaranty as well as a blanket security interest in all of Plaintiff's assets.

75.    The MCA Agreement was an unconscionable contract of adhesion that was not negotiated at arms-length.

76.    Instead, it contained the typical MCA one-sided terms that prey upon the desperation of businesses and their individual owners  and help conceal the fact that the transactions, including the ones involving Plaintiff, are really loans.

77.    Among these one-sided terms, the MCA Agreement included: (1) a provision giving Defendant the irrevocable right, through a "power of attorney," to withdraw money

directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring its assets, (3) a provision prohibiting selling the business without permission from Defendant, (4) a one-sided attorneys' fees provision obligating the merchant to pay Defendant's attorneys' fees but not the other way around, (5) a personal guarantee, (6) a jury trial waiver, (7) a class action waiver, (8) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (9) a prohibition of obtaining financing from other sources and (10) a power-of-attorney authorizing Defendant to take any action or execute any instrument or document to settle all obligations due.

78.    Additionally, although the agreement nominally contained a "reconciliation" provision, the provision was a sham for the reasons discussed herein.

79.    For example, Defendant conditioned granting reconciliation on Plaintiff providing any and all documents that Defendant might request; Plaintiff's failure to provide every document that Defendant could possibly request provided Defendant with a complete basis to deny the reconciliation regardless of changes to Plaintiff's receivables.

80.    Courts have construed such conditions in MCA agreements as rendering the reconciliation provisions illusory such that they are actually loans. *See, e.g., Haymount Urgent Care PC v. Go Fund Advance, LLC*, 609 F. Supp. 3d 237, 248-49 (S.D.N.Y. 2022) (finding MCA agreements like loans where "while the reconciliation provision purports to be 'mandatory,' its structure nonetheless vests substantial discretion in [MCA lender] to deny reconciliation: the reconciliation provision expressly permits the lender 'to request additional documentation . . . and notes that 'refusal to provide access shall be a breach' such that the lender 'shall have no obligation to reconcile. It is readily apparent how the lender could use this contractual right to obtain from the merchant further documentation as a procedural pretext for denying reconciliation'"); *Lateral*

*Recovery LLC v. Queen Funding, LLC*, 21 Civ. 9607 (LGS), 2022 U.S. Dist. LEXIS 129032, at *15 (finding reconciliation provision in an MCA agreement illusory where it provides "'if the Merchant fails to furnish the requested documentation within five (5) business days following the end of a calendar month, then Queen Funding shall not effectual the reconciliation"); *Lateral Recover, LLC v. Cap. Merch. Servs., LLC*, 632 F. Supp. 3d 402, 461 (S.D.N.Y. 2022) ("CMS") ("It is thus also plausible to read the reconciliation provision as being virtually illusory. In the first place, the provision is contingent upon the merchant producing satisfactory documentation to the funder providing the funder a ready means to deny reconciliation"); *AKF, Inc. v. W. Foot & Ankle Ctr.*, 632 F. Supp. 3d 66, 77 (E.D.N.Y. 2022) (similar); *McNider Mar., LLC v. Yellowstone Capital, LLC*, 2019 NY Slip Op 33418(U), at *9 (Sup. Ct. Nov. 19, 2019) (similar).

81.    In addition, the MCA Agreement provides that Defendant would perform the requested reconciliation—to the extent granted—within five business days, which was an intentional ploy to prevent Plaintiff, or any merchant for that matter, from utilizing reconciliation  because missed payments would constitute an event of default under the MCA Agreement, thereby rendering Defendant entitled to enforce the entire debt, and invalidating any other avenue of relief that Plaintiff might otherwise have (for example, being in default, a bankruptcy filing would not relieve Plaintiff of the amounts owed).

82.    Additionally, the reconciliation – if granted – would not adjust any improper excessive past withdrawals, but would only make adjustments on a going-forward basis.

83.    Thus, Defendant designed its reconciliation  to fail, because the merchant would be placed in default  if it missed its fixed payment while its reconciliation request was still pending—which is certain  since a merchant can only request reconciliation where it is experiencing a slowdown in projected  revenue—and being in default automatically makes the

entire amount of the loan due.

84.     Courts have found such reconciliation provisions that would put the merchant in default before reconciliation would be performed based on missed payments to be illusory and render the MCA agreements being loans. *See CMS*, at 456-57. 28.

85.     The fact that the MCA Agreement would place Plaintiff in default for simply missing a fixed payment over the course of the MCA Agreement's term renders it a loan. In fact, numerous courts have ruled less onerous default provisions render MCA agreements loans. *See CMS*, at 458 (finding MCA agreement like a loan where the "merchant has to pay a fixed amount on a daily basis. If it fails to do so just three times, a default is declared"); *Davis v. Richmond Capital Group*, 194 A.D.3d 516, 517 (1st Dep't 2021) (finding MCA agreements like a loan where there were "provisions making rejection of an automated debit on two or three occasions without prior notice an event of default"); *Queen Funding*, at *18 (finding MCA agreements loans where "an 'Event of Default' occurs is 'attempted ACH debit of the Specific Daily Amount is rejected two times during the term"); *People v. Richmond Capital Group LLC*, 451368/2020, 2023 NYLJ LEXIS 2487, *7-8 (Sup. Ct. Sept. 20, 2023) (finding MCA agreements to be loans where default would occur after three missed payments).

86.     Additionally, as described further herein, here Defendant did not even reconcile Plaintiff's account to reflect Plaintiff's future anticipated revenue, and ultimately refused to reconcile altogether notwithstanding the fact that Plaintiff had no revenue coming in.

87.     In these and other ways, Defendant used a sham reconciliation provision in the MCA Agreement to disguise the Loan as a purported merchant cash advance.

88.     Additionally, the MCA Agreement also contained a *de facto* fixed term of 62 weeks, easily calculated by dividing the amount Plaintiff owed by the amount of the weekly

payment, and a failure to pay would not indefinitely extend the term because the agreement

provides that a default would occur if any terms of the agreement were breached or if a single

payment was not made during the term of the agreement, whereupon Defendant would have the

right to exercise all remedies in connection with the agreement, including accelerating the debt

and collect the entire amount owed, enforcing its security interest in the collateral, and enforcing

the guarantee.

89.    Additionally, Defendant had full recourse in bankruptcy, as the agreement did not

provide that a slowdown in business or bankruptcy would excuse payments, but rather said that

"Seller going bankrupt or going out of business, **in and of itself**, does not constitute a breach of

this Agreement." (emphasis added).  However, as full payment of the purchase price would be

due immediately under a number of conditions, including any violation of any term of the

agreement, and the personal guaranty did not have any provision of non-applicability in the event

the business went bankrupt, Defendant bore nearly no risk of the receivables' non-performance

and would recover the Purchased Amount even if the receivables turned out to be uncollectable.

90.    Similarly, Defendant bore no real transfer of risk because the repayment and

remedy terms of the agreements shielded Defendant from the risk that the purchased receivables

may be uncollectable, since if the specified weekly amount was rejected even one time, payment

would become immediately due and Defendant would be allowed to foreclose on the collateral,

including any collateral held by the guarantor.

91.    Thus, despite its documented form, the transaction between Plaintiff and

Defendant was, in  economic reality, a Loan that is absolutely repayable.  Besides for the issues

discussed above, among other hallmarks of a loan:

    (a)    The weekly payments required by the MCA Agreement were fixed
        and the so-called  reconciliation provisions were mere subterfuge to

avoid this state's usury laws. Rather, just like any other loans, the purchased amounts were to be repaid within a specified time;

(b)    The default and remedy provisions purported to hold Plaintiff absolutely liable for repayment of the purchased amounts;

(c)    While the MCA Agreement purported to "assign" all of Plaintiff's future account receivables to Defendant until the purchased amount was paid, Plaintiff retained all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof. Indeed, rather than purchasing receivables, Defendant merely acquired a security interest in all of Plaintiff's assets to secure payment of the purchased amount;

(d)    The MCA Agreement does not identify specific receivables of Plaintiff that Defendant purportedly purchased, and it was Plaintiff —not Defendant—that was responsible for collecting receivables Defendant allegedly purchased. This feature in MCA agreements has been found by courts to render them loans. *See Haymount*, 609 F. Supp. 3d at 249 ("***Nor does any MCA agreement identify particular revenues or accounts that*** *were supposedly purchased, so there is no transfer of 'risk of nonpayment by any specific customer. Moreover, the MCA agreements leave merchants with the responsibility to collect revenues from all their accounts*") (emphasis added);

(e)    Unlike true receivable purchase transactions, the MCA Agreement was underwritten based upon an assessment of the Plaintiff's credit worthiness – not the creditworthiness of any account debtor;

(f)    The purchased amount was not calculated based upon the fair market value of the Plaintiff's future receivables, but rather was unilaterally dictated by Defendant based upon the interest rate it wanted to be paid. Indeed, as part of the underwriting process, Defendant did not request any information concerning the Plaintiff's account debtors upon which to make a fair market determination of their value;

(g)    The amount of the daily payments were determined based upon what Defendant wanted to be paid, and not based upon any good-faith estimate of the Plaintiff's future account receivables;

(h)    Defendant assumed no risk of loss if Plaintiff failed to generate sufficient receivables, because the failure to maintain sufficient funds in the designated account Defendant took ACH debits from constituted a default under the MCA Agreement;

(i)     Defendant required that Plaintiff undertake certain affirmative obligations and make  certain representations and warranties that were aimed at ensuring the company  would continue to operate and  generate  receivables  and  a  breach  of  such  obligations, representations and  warranties constituted  a  default, which  fully protected Defendant from any risk of loss resulting from Plaintiff's failure to generate  and collect receivables.

(j)     Defendant required that Plaintiff grant it a security interest in all of its receivables  and  other  intangibles  and,  further  required  that  the individual  owner  personally  guarantee  the  performance  of  the representations, warranties and covenants of Plaintiff.

92.     Thus, the transaction was clearly a loan and not a legitimate merchant cash advance.

93.     While Plaintiff was able to make the weekly payments initially, there was no way that the company could maintain these crushing payments, especially as its business began to slow down.

94.     In October 2023, Barker called Defendant and spoke with a representative named Maniq Williams.

95.     Barker advised Williams that he was reaching out because the weekly loan payments were too high, which was significantly damaging the business' cash flow and overall financial health, and therefore Plaintiff was requesting more manageable loan repayment terms.

96.     Williams asked Barker to provide bank statements, and then said that if Defendant adjusted the payments, Plaintiff would be paying even more, and so it should continue paying $8,112.33 every week.

97.     In November 2023, Barker reached out again to Defendant to complain that Plaintiff could not afford Defendant's excessive weekly payments, which were simply too high to be supported by the income Plaintiff was bringing in.

98.     Barker spoke with a Mackenzie Holsten, and explained again that the company

could not afford to make the payments and asked for a more reasonable number.

99.    Barker also expressed his confusion as to how the payback amount was going to be $502,964, when he had been told that his payback for the loan was going to be a flat 12%, which should have only been $42,504 in interest and not $148,764.

100.    Barker said that the numbers did not make any sense and asked for an amortization schedule for the loan.

101.    Barker did not get a good answer from Ms. Holsten, but Defendant thereafter lowered the weekly payment to $4,877.64, which lasted until February 2024.

102.    Once they lowered the amount of the payment, every month Defendant would ask Plaintiff for bank statements, which Plaintiff always provided.

103.    The company had a very good January and February, and in February 2024, Defendant switched the payment back to $8,112.33 per week.

104.    However, in March business went to a crawl, and Barker complained to Defendant that the weekly payments were killing the company and that Springs were always difficult because there was not a lot of business.

105.    In April 2024, the payment was lowered to $2,201.93.

106.    In May 2024, Defendant raised the weekly payment to $5,631.08, and in June 2024 they snapped it back to $8,112.33, even though Plaintiff had no money coming in.

107.    Barker called and left numerous messages with Defendant during this time period complaining that the amounts were too high and that the Company's revenues could not support them, but nobody got back to him.

108.    On June 4, Barker explicitly emailed Defendant and told them that Plaintiff had no money coming in for weeks, and that his wife had had to deposit her own personal funds into

the account in order to cover payroll.

109.    Defendant said they would do a reconciliation and advise him of the result, but they never did.

110.    Barker continued to call and protest that Plaintiff could not afford to make these payments and needed lower payments because the company's projections for the next few months were low, and that Defendant was not properly calculating the amount that the company was receiving, because they were making calculations based on past revenue rather than projections of the company's future revenue.

111.    Defendant ignored the communications.

112.    Plaintiff was forced to lay off 60% of its staff and was still unable to make the weekly payments.

113.    Barker called and emailed Defendant and begged for the payments to be lowered or paused, but nothing was done and the payments stayed the same.

114.    Plaintiff did not have enough funds to make the weekly payments, and even though Barket had advised Defendant of this, Defendant continued to debit Plaintiff's account for the $8,112.33 per week, which created more debt for Plaintiff as the bank fees continued to pile up since Plaintiff did not have the funds for the debits to clear.

115.    Barker continued to call and leave messages for Defendant, all of which were ignored.

116.    On July 16, 2024, a payment was returned for lack of funds in the account.

117.    Defendant emailed and once again said they would do a reconciliation and let Barker know what the result was, and Barker asked if payments could be held off for a little bit because business was very slow and had little coming in.

118.    Barker provided all requested documentation.

119.    However, Defendant did not change the payment amount and continued to try to debit the account for the $8,112.33 per week, which continued to not have sufficient funds.

120.    Barker specifically informed Defendant that the company did not have the money to cover the payments and that every time they tried to debit, Plaintiff would just get hit with more fees.

121.    However, Defendant ignored the email and continued to debit.

122.    In August Plaintiff had no choice but to close the bank account because Barker was concerned that the bank would initiate some sort of fraud inquiry against the company since the account kept getting debited for funds the company did not have.

123.    Thereafter, on August 12, Barker received a communication from Defendant informing him that his bank account had been closed and that now Plaintiff was in breach of contract and demanding another bank account to make the payments.

124.    Two days later, Defendant mailed lien notices to Plaintiff's customers telling them that they had to make all payments of outstanding money owed to Defendant, in complete contradiction to Dweck's statement to Barker inducing Plaintiff to enter into the agreement with Defendant that they don't file UCC liens.

125.    Since then, Plaintiff has not received a single payment from these customers, and there is approximately $90,000 in outstanding revenue that Plaintiff's customers have not paid to them.

126.    Due to this unpaid revenue, Plaintiff is now on the verge of having to permanently shut down.

## FIRST CAUSE OF ACTION
### (28 U.S.C. § 2201: DECLARATORY RELIEF)

127.    Plaintiff repeats and re-alleges the allegations of each of the foregoing paragraphs.

128.    More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

129.    In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

130.    As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

131.    As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

132.    This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

133.    As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

134.    The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

135.    Like here, this was a purely artificial device used by the loan-shark to evade the

law—an evasion that the Legislature sought to prevent.

136.    Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

137.    New York has set its limit at 16% for civil usury, and 25% for criminal usury.

138.    Under controlling New York law, therefore, Plaintiff's MCA Agreement is void *ab initio*. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 157 N.Y.S.3d 800, 179 N.E.3d 612 (2021).

139.    Here, Defendant's agreement exceeded the 25% criminal usury cap and therefore is an illegal and unenforceable agreement.

140.    Defendant's reconciliation provision was nothing more than a sham, as Defendant refused to reconcile and continued to debit Plaintiff's account for the full amount notwithstanding the fact that Plaintiff did not have revenues coming in to support the payment and Plaintiff repeatedly requested reconciliation.

141.    Additionally, the agreement by its terms does not to require a reconciliation, as explained above, as all it states is that one may be requested, but it does not obligate the Defendant to perform one.

142.    Moreover, as it relates specifically to Plaintiff, Defendant performed no reconciliation notwithstanding Defendant's actual knowledge that Plaintiff had no receivables

143.    The agreement also contained a *de facto* fixed term of 62 weeks, easily calculated by dividing the amount Plaintiff owed by the amount of the weekly payments, and a failure to pay would not indefinitely extend the term because the agreement provides that Defendant can enforce its security interest in the collateral and enforce the guarantee.

144.    Additionally, the agreement provided that Defendant had full recourse in the event of bankruptcy under a number of conditions, including under the personal guaranty which is not excused by a corporate bankruptcy, and thus Defendant would bear nearly no risk of the receivables' non-performance and would recover the Purchased Amount even if the receivables turned out to be uncollectable.

145.    Similarly, Defendant bore no real transfer of risk based on the onerous and oppressive terms of the agreement.

146.    Thus, it is clear that this transaction was really a usurious loan and not a legitimate merchant cash advance.

147.    Because the transaction was really a usurious loan and not a legitimate merchant cash advance, the UCC lien is void and without effect. *See, e.g.*, In re McCorhill Pub., Inc., 86 B.R. 783, 794-95 (Bankr. S.D.N.Y. 1988) ("As to SFC's loan, this court has determined that this loan is usurious. Therefore, the loan and its supporting documents, including the SFC security agreement with the debtor which grants to SFC a security interest in the debtor's equipment, accounts receivable, inventory and personalty, are void and without effect. GNYSB was never entitled to file a UCC-1 as to the debtor's inventory.")

148.    As a result of Defendant's criminally usurious conduct, it is not entitled to issue any UCC letters to Plaintiff's customers, as its purported security interest is a legal nullity.

149.    There is thus a substantial controversy between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

150.    A declaratory judgment is required to determine the rights and obligations of the parties with respect to the purported security interest and UCC-1, which is void as a matter of law, declaring that the Defendant has no right to any security rights thereto, and that Defendant is barred from enforcing the unconscionable and illegal interest rates on the sham loan through any future UCC lien letters.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

151.    Plaintiff repeats and re-alleges the allegations of each of the foregoing paragraphs.

152.    Defendant breached the parties' agreement when it failed to perform a reconciliation, further revealing the sham nature of the "Merchant Cash Advance."

153.    Defendant was specifically informed that Plaintiff did not have receivables in an amount necessary to support the weekly payments.

154.    Rather than reconciling the payments based on Plaintiff's actual receivables, Defendant instead breached the parties' agreement and simply ignored Plaintiff's request.

155.    Defendant did this knowing that Plaintiff did not have receivables matching the alleged receivables justifying the amount of the weekly payment, and knowing that Defendant would default under such payments.

156.    Plaintiff then predictably defaulted under the agreement, and Defendant used the opportunity to send out UCC lien letters to Plaintiff's customers to wrongfully freeze and abscond with Plaintiff's receivables.

157.    Accordingly, Defendant materially breached the parties' agreement and damaged Plaintiff by on multiple occasions failing to legitimately reconcile the account.

158.    As a result of Defendant's actions in breach of contract, Defendant has caused substantial harm and damages to Plaintiff, including the freezing of Plaintiff's revenue and the imminent destruction of Plaintiff's business.

159.    Additionally, Defendant breached the parties' contract by charging Plaintiff $10,626 in sham processing fees, even though Defendant had little to no processing costs or expenses.

160.    This is not just a private dispute between the parties but one that affects the public at large, as Defendant has engaged in this fraudulent and usurious conduct and pulled this scheme on many members of the public.

161.    As such, Plaintiff is entitled to punitive damages as well.

## THIRD CAUSE OF ACTION
### (Fraudulent Inducement)

162.    Plaintiff repeats and re-alleges the allegations of each of the foregoing paragraphs.

163.    Defendant fraudulently induced Plaintiff to enter into the MCA agreement at issue by fraudulently misrepresenting that Defendant does not file UCC liens against merchants, that the transaction was a loan (when Defendant always intended to subsequently say that it was not a loan but rather a "merchant cash advance"), and that the loan was going to carry a flat 12% interest rate.

164.    Defendant, however, clearly does file UCC liens against merchants, something that it has done many times; Defendant, despite repeatedly characterizing the transaction as a loan, knew that it always intended to deny that the transaction was a loan; and Defendant knew that the loan did not carry a 12% interest rate, but rather a criminally usurious 35% interest rate.

165.    Defendant knew that these representations were false and misleading at the time they were made.

166.    These false representations were made in order to induce desperate victims like Plaintiff into entering into Defendant's predatory and usurious MCA Agreement.

167.    Plaintiff reasonably relied upon Defendant's (mis)representations in entering into the MCA Agreement.

168.    Accordingly, by reason of the foregoing, Plaintiff is entitled to a judgment voiding the agreement and awarding Plaintiff its out-of-pocket damages.


## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in its favor against Defendant, and seeks an order from the Court:

a)    Declaring that Defendant does not have any security interest in Plaintiff's receivables, and that therefore any UCC lien letters issued by Defendant are null and void;

b)    Granting an injunction against Defendant permanently enjoining them from enforcing any of their rights under the usurious loan through the use of UCC lien letters;

c)    Awarding the Plaintiff direct and consequential damages in an amount to be determined at trial, together with punitive damages;

d)    Awarding Plaintiff its attorney's fees and costs incurred in this action; and

e)    Granting such other and further relief as this Court deems just and proper.

Dated: Fresh Meadows, New York
        September 11, 2024

   _/s/ Jonathan E. Neuman_____
JONATHAN E. NEUMAN, ESQ.
*Attorney for Plaintiff*
176-25 Union Turnpike, Suite 230
Fresh Meadows, New York 11366
(347) 450-6710
(718) 228-3689 *facsimile*
jnesq@jenesqlaw.com