UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DIVISION 5, LLC,

Plaintiff,

-v-

FORA FINANCIAL ADVANCE, LLC,

Defendant.

24-CV-6870 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

On October 11, 2024, the Court granted a motion for a preliminary injunction filed by

Plaintiff Division 5, LLC ("Division 5") against Defendant Fora Financial, LLC ("Fora") barring

Fora from collecting on a debt owed to it by Division 5 under a Merchant Cash Advance

("MCA") agreement.  (ECF No. 27.)  Division 5 argued that the contract violates New York

usury laws and is therefore unenforceable, that Fora breached the contract, and that Fora

fraudulently induced Division 5 to sign the contract.  In its order issuing the preliminary

injunction, the Court stated that its reasons would be explained in a forthcoming opinion.  This is

that opinion.

## I.    Background

The following facts are taken from the parties' sworn declarations and are uncontradicted

unless otherwise indicated.  This case concerns a dispute over what is commonly called a

"Merchant Cash Advance" agreement, in which a company receives a short-term, lump-sum

payment in exchange for a promise to deliver a fixed percentage of its future accounts receivable.

Plaintiff Division 5, a business specializing in "structural steel and miscellaneous metals

fabrications and installation for general contractors and construction managers" (ECF No. 5-2

("Barker Dec.") ¶ 2), executed such an agreement with Defendant Fora Financial Advance, LLC

on June 29, 2023 (Headley Dec. ¶¶ 4, 6).  Division 5 is owned by Conrad Barker, based in Connecticut, and has been in business for 11 years.  (*Id.* ¶¶ 1-2.)

In April 2023, Barker began receiving unsolicited emails from Victor Dweck "wanting to speak with [him] about providing a loan" to Division 5.  (*Id.* ¶ 3.)  In his initial email, Dweck informed Barker that "when his company loans, they never file UCC liens against the business." (*Id.*; *see also* ECF No. 5-4 at 2-3.)  Barker, following Dweck's guidance, submitted an application and supporting documentation, after which Dweck informed Barker that he "was approved for a $350,000 loan with a term of 15½ months, and that [he] would be receiving a call from [Fora]."  (Barker Dec. ¶ 5.)  Barker spoke with a representative of Fora and, while on the phone with the representative, signed an electronic contract through DocuSign.  (*Id.*)  While Barker declares that Fora "did not give [him] the opportunity to review the contract" and "just told [him] to click in all of the DocuSign boxes," a transcript of the call provided by Fora shows that Barker acknowledged having "read and understood the terms and conditions of the purchase and sale of future receivables agreement," and that he signed the agreement before joining the call.  (ECF No. 19-5 at 3.)  Barker claims that, on the call, Fora referred to the transaction as a "loan of $354,200 with a payback of 12% of the principal, and that [Barker] would have to make initial weekly payments of $8,112.33."  (Barker Dec. ¶ 5.)  The call transcript shows that Fora described the transaction as "purchasing $502,964 of [Division 5's] future receivables for a purchase price of $354,200," and explained that "[t]he purchase percentage of this agreement is 12 percent of your future receivables."  (ECF No. 19-5 at 4.)  Fora stated that "[t]he remittance amount is going to be $8,112.33 and this is going to be remitted weekly."  (*Id.*)

Following the call, Fora wired $343,574—the purchase price less a fee disclosed to Barker on the call—to Division 5.  (ECF 19-1 ("Headley Dec.") ¶ 6.)  Fora then began debiting

weekly payments from Division 5's bank account (Barker Dec. ¶ 7), ultimately totaling $312,741.51 before Division 5 stopped paying.  (Headley Dec. ¶ 8.)  In the latter half of 2023, Division 5's business began to slow and, in October, Barker requested a reduction in his weekly payments, also called a "reconciliation."  (Barker Dec. ¶ 7.)  Following a second request in November 2023, Fora reduced Division 5's weekly payments to $4,877.64.  (*Id.* ¶ 8; *see also* ECF No. 19-4 ("Transaction History") at 2.)  In February 2024, Fora raised Division 5's payments back to $8,112.33.  (Transaction History at 2.)  In April, Barker again requested a reconciliation, and Fora reduced the payments to $2,201.93.  (*Id.*)  In May, Fora raised the payments again, first to $5,631.08, and then back to the original amount of $8,112.33.  (*Id.* at 3.) Neither party in their declarations contends that Fora formally requested a reconciliation when it raised Barker's weekly payments.

Starting in July, Fora's weekly debits from Division 5's accounts began bouncing due to lack of funds, causing Barker to incur bank fees.  (*Id.* ¶ 10.)  Barker "continued to call and leave messages for [Fora], all of which were ignored."  (*Id.*)  In August, Barker closed Division 5's bank account because he "was concerned that the bank would initiate some sort of fraud inquiry."  (*Id.*)  Fora then contacted Barker informing him that he was in breach of contract and demanding information for an alternate bank account.  (*Id.* ¶ 11.)  When Barker did not provide one, Fora mailed UCC lien notices to several of his customers.  (*Id.* ¶ 11; *see also* ECF No. 13 ("TRO Trans.") at 4.)  The liens covered approximately $90,000 in unpaid revenue and allegedly placed Division 5 at risk of an immediate shutdown.  (Barker Dec. ¶¶ 12-13.)

On September 11, 2024, Division 5 filed a Complaint alleging a violation of New York's criminal usury laws, breach of contract, and common-law fraudulent inducement, invoking this Court's diversity jurisdiction.  (ECF No. 1 ("Compl.").)  On the same day, it filed an emergency

motion for a temporary restraining order ("TRO") and preliminary injunction (ECF No. 5), which Fora opposed via letter on September 12 (ECF No. 9). The Court granted the TRO request. (ECF No. 10.) Fora then filed a motion to compel arbitration and dismiss the complaint on September 20 (ECF No. 15), as well as a memorandum of law opposing the extension of the TRO into a preliminary injunction on October 1 (ECF No. 19 ("PI Opp.")). Division 5 replied in support of its request for a preliminary injunction on October 8 (ECF No. 24), and opposed the motion to compel arbitration and dismiss the complaint on October 11 (ECF No. 26). Fora replied in support of its motion to compel arbitration and dismiss the complaint on October 25. (ECF No. 30.) After a telephonic hearing on October 11, 2024, the Court granted Division 5's request for a preliminary injunction barring Fora from attempting to collect on its UCC liens, declaring the liens null and void, and enjoining Fora from using any alternate methods to collect on the debt owed by Division 5. (ECF No. 27.) This opinion explains the reasoning for that injunction.

## II.    Legal Standard

A party seeking a preliminary injunction must show "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 119 (2d Cir. 2022) (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)).

## III.    Discussion

The Court rests its decision to issue a preliminary injunction on Division 5's usury claim and therefore does not address its contract and fraud claims at this time.

### A.    Irreparable Harm

"Irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233-34 (2d Cir. 1999) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983)).  "The movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages."  *Id.* (quoting *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995)).

Division 5 argues, based on its owner's sworn declaration, that it faces imminent collapse of its business if Fora is permitted to enforce its UCC liens.  (Barker Dec. ¶¶ 13-14.)  Fora responds that this claim is "conclusory," as it is unaccompanied by financial documentation and does not show why the $90,000 covered by the liens is essential to Division 5's solvency.  (PI Opp. at 10.)  To the extent Fora is suggesting that the Court cannot consider Plaintiff's sworn declarations, it is wrong.  *See, e.g.*, *Lost Lake Holdings LLC v. Town of Forestburgh*, No. 22-CV-10656, 2023 WL 8947154, at *1 n.1 (S.D.N.Y. Dec. 28, 2023) (rejecting the same argument).  While Fora might have a persuasive objection at trial, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  Barker's declaration provides sufficient details of the business's circumstances to convince the Court at this stage.  It states that Division 5's customers received lien notices and stopped paying, provides an amount of outstanding revenue, and states a timeframe for the business' shutdown.  (Barker Dec. ¶¶ 11-13; .)  Division 5 also paid weekly debits for nearly a year, only stopping once the payments began bouncing for lack of funds.  (*Id.* ¶¶ 7-10.)  Due to the bounces, Division 5 incurred bank fees that further harmed its business.  (*Id.* ¶ 10.)  The amount ostensibly owed to Fora—over $190,000—is also more than double the $90,000 that was

covered by its UCC lien notices. (Headey Dec. ¶ 8.) Were Fora aware of additional customers whose payments Division 5 could use to sustain operations, it is doubtful that Fora would have voluntarily refrained from sending lien notices to those customers.

Numerous "courts in this district have found that asset freezes imposed by defendants in MCA cases which threaten a plaintiff's business with collapse show irreparable harm." *Stellar Beach Rentals, LLC v. Redstone Advance, Inc.*, No. 23-CV-955, 2023 WL 4421809, at *3 (S.D.N.Y. July 8, 2023) (collecting cases); *see also PrecisionWorks MFG, LLC v. Union Funding Source, Inc.*, No. 22-CV-8290, 2022 WL 16857360, at *1 (S.D.N.Y. Oct. 25, 2022) (granting a TRO). This "aligns with the broader principle that 'when the potential economic loss is so great as to threaten the existence of the moving party's business, then a preliminary injunction may be granted, even though the amount of direct financial harm is readily ascertainable.'" *Stellar Beach Rentals*, 2023 WL 4421809, at *3 (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1, p. 157 (3rd ed. 2013)).

Because the facts in Barker's declaration, particularly the lack of any incoming revenue while the lien notices were valid, establish a risk of collapse, Division 5 has adequately shown a risk of irreparable harm.

### B.    Serious Questions / Balance of Hardships

Division 5 must next show *either* a likelihood of success on the merits *or* a combination of a favorable balance of hardships and serious questions worth litigating. *RiseandShine Corp.*, 41 F.4th at 119. Here, the balance of hardships decidedly favors the movant. Division 5 faces a complete collapse of its business due to its inability to make payroll, purchase supplies, and pay employee health insurance and other essential expenses. (Barker Dec. ¶ 13; ECF No. 13 at 3:2-20.) Fora, on the other hand, faces only a delay in the payment of Division 5's debt—an injury most appropriately remedied with money damages. *See Conn. Mun. Elec. Energy Coop. v. Nat'l*

*Union Fire Ins. Co. of Pittsburgh*, No. 19-CV-839, 2022 WL 3716445, at *5 (D. Conn. Aug. 29, 2022) ("Absent some . . . harm <u>beyond</u> the mere delay in payment, [non-movant] has failed to establish that its injury cannot be compensated by monetary damages." (emphasis in original)); *see also Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of VA.*, 144 F. Supp. 2d 241, 249 (S.D.N.Y. 2001) (freezing the defendant's assets where "the injunction would ensure that [plaintiff] would be paid in the future should it prevail, but it would not shut down [the defendant's] corporations"). Division 5 is also a much smaller business than Fora, which weighs in Division 5's favor. *See Shred-It, USA, Inc. v. Mobile Data Shred, Inc.*, 202 F. Supp. 2d 228, 234 (S.D.N.Y. 2002) (comparing the risk of harm to a "relatively small business" and a "large international business"). And Fora provides no evidence that Division 5 will become insolvent or dissipate its funds if allowed to keep receiving payments from its customers—rather, it is Fora's lien notices that are allegedly threatening Division 5 with collapse. Accordingly, Division 5 need only prove that it has raised serious legal questions. It has met that burden.

New York's civil usury prohibitions are contained in General Obligations Law §§ 5–501, 5–511, and 5–521, and Banking Law § 14–a (1). Its criminal usury prohibition is contained in Penal Law § 190.40. The criminal prohibition makes it a "class E felony when, without other legal authorization, the lender, 'knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding 25% per annum or the equivalent rate for a longer or shorter period'." *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 326 (2021) (quoting N.Y. Penal Law § 190.40) (brackets omitted). "[I]f [a] borrower establishes the defense of usury in a civil action, the usurious loan transaction is deemed void and unenforceable," and the "same result obtains when the 25% interest rate cap set forth in Penal Law § 190.40 . . . applies to a loan to a corporation

and the interest charged on the loan exceeds that cap." *Id.* "Without doubt, New York's voiding of usurious contracts can be harsh . . . but the penalty reflects the legislature's consistent condemnation of the evils of usury." *Id.* at 332 (quotation marks omitted).

Here, Division 5 has alleged, and Fora does not deny, that the effective interest rate in the MCA agreement exceeds the 25% cap.  Defendant argues, however, that there is no usury because the agreement is not a loan.  *See LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 122 N.Y.S.3d 309, 312 (2d Dep't 2020) ("[W]here there is no loan, there can be no usury, however unconscionable the contract may be.").  New York courts have adopted a holistic, totality-of-circumstances test to determine "whether a transaction constitutes a usurious loan." *Id.*  The crux is whether the putative lender "is absolutely entitled to repayment under all circumstances"—in which case the transaction is a loan—or whether repayment is contingent. *Id.* (quoting *K9 Bytes, Inc. v. Arch Cap. Funding, LLC*, 57 N.Y.S.3d 625, 632 (Sup. Ct. Westchester Cnty. 2017)).  Courts typically "weigh three factors when determining whether repayment is absolute or contingent: (1) whether there is a reconciliation provision[1] in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy," but the transaction "must be 'considered in its totality and judged by its real character, rather than by the name, color, or form which the parties have seen fit to give it.'"  *Id.* (quoting *Abir v. Malky, Inc.*, 873 N.Y.S.2d 350, 354 (2d Dep't 2009)). The Second Circuit has emphasized that "'substance—not form—controls' when a court determines whether a transaction is a loan."  *Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC*, No. 22-1885, 2023 WL 3882697, at *2 (2d Cir. June 8, 2023) (quoting *Adar Bays*, 37 N.Y.3d at

---

[1] Reconciliation is a consensual modification of scheduled payments, typically based on changes in receivables.  *See K9 Bytes, Inc. v. Arch Cap. Funding, LLC*, 57 N.Y.S.3d 625, 632 (N.Y. Sup. Ct. 2017).

334) (citing *O'Donovan v. Galinski*, 878 N.Y.S.2d 443, 444–45 (2d Dep't 2009) ("In

determining whether a transaction is usurious, the law looks not to its form, but its substance, or

real character." (quotation marks omitted)).

While many state trial courts have found that MCA agreements like the one in this case

are not loans, *see, e.g.*, *Fora Financial Funding, LLC v. Nathan's Realty, LLC*, 2024 N.Y. Misc.

LEXIS 3005, at *2 (Sup. Ct. Nassau Co. 2024),[2] a number of federal courts have reached the

opposite conclusion, including several in this district.  *See, e.g.*, *Inventory Generation Inc. v.

Proventure Cap. Funding LLC*, No. 22-CV-10529, 2023 WL 2609344, at *5-6 (S.D.N.Y. Mar.

23, 2023) (granting a preliminary injunction where plaintiff challenged an MCA agreement as

"criminally usurious, fraudulently induced, unconscionable, and illegal"); *Stellar Beach Rentals*,

2023 WL 4421809, at *1 (granting a preliminary injunction where "[t]he gravamen of the

allegations in Plaintiffs' complaint is that Defendants offer MCA contracts that

are . . . effectively usurious loans"); *PrecisionWorks*, No. 22-CV-8290, ECF No. 29 (granting a

TRO based on similar allegations).

Fora raises two objections to the reasoning in these cases.  First, it argues that

corporations can raise criminal usury as a defense only in a legal action to collect a debt.  (PI

Opp. at 12.)  Second, it argues that the agreement here is not a loan.  (*Id.* at 13.)  The Court

addresses each in turn.

Although Penal Code § 190.40 permits "a corporation [to] interpose an affirmative

defense of usury and, if successful, obtain a declaration that invalidates the debt instrument <u>ab</u>

---

[2] Nearly all of the cases Defendant cites are from the Nassau County Supreme Court. (*See* PI Opp. at 14 (collecting cases).)  Their reasoning is largely the same—that the challenged agreements formally comply with the three factors announced in *LG Funding*, 122 N.Y.S.3d at 312, and that they must therefore be loans.  The cases do not engage in a substantive analysis of how the agreements work in practice.

initio," "New York courts have uniformly construed this statute as limited to the affirmative

defense, and they have prohibited corporations from bringing affirmative claims or

counterclaims alleging criminal usury and seeking to invalidate an agreement." *Haymount

Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 254 (S.D.N.Y. 2022); *see also

Collins v. MCA Receivables, LLC*, No. 23-CV-353, 2024 WL 246111, at *4 (S.D.N.Y. Jan. 23,

2024) (same); *Streamlined Consultants, Inc. v. EBF Holdings LLC*, No. 21-CV-9528, 2022 WL

4368114, at *3 (S.D.N.Y. Sept. 20, 2022) (same); *accord Paycation Travel, Inc. v. Glob. Merch.

Cash, Inc.*, 192 A.D.3d 1040, 1041 (2021). This is because it would be improper for a

corporation to "use a shield created by the Legislat[ure] as a sword." *Scantek Med., Inc. v.

Sabella*, 582 F. Supp. 2d 472, 474 (S.D.N.Y. 2008) (quoting *Zoo Holdings, LLC v. Clinton*, 814

N.Y.S.2d 893, 893 (Sup. Ct. 2006)); *see also Lloyd Cap. Corp. v. Pat Henchar, Inc.*, 80 N.Y.2d

124, 128 (1992) ("[F]orfeitures by operation of law are disfavored, particularly where a

defaulting party seeks to raise illegality [of a contract] as a sword for personal gain rather than a

shield for the public good." (quotation marks omitted)). Accordingly, when plaintiffs have

sought to vacate previous judgments based on allegedly usurious loans, *see, e.g.*, *Paycation*, 192

A.D.3d at 1040, or declaratory judgments that such agreements are void, *see, e.g.*, *Collins*, 2024

WL 246111, at *4, state and federal courts have sided with defendants.

      Here, however, Division 5 does not seek a declaratory judgment invalidating the

agreement, but rather a judgment invalidating Fora's UCC liens. (Compl. ¶ 150.) As far as the

Court is aware, such a request is a matter of first impression in both the state and federal courts,

and the parties were unable to locate any directly apposite case at the hearing held on October

11, 2024.  Looking at the history and purpose[3] of New York's usury laws, the Court is persuaded

that Division 5 has at least raised a substantial question of whether they may be used in this way.

Before 1965, "corporations were prohibited from interposing the defense of usury in any action."

*Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981) (quotation marks omitted).

The exception allowing corporations to assert the defense of criminal usury was then added as a

practical means of "curbing the loan-shark racket" and preventing lenders from circumventing

the criminal usury law by "mak[ing] it a policy to loan to corporations" or forcing "individual

borrowers . . . to incorporate before being granted a usurious loan." *Id.* at 589-90 (quoting N.Y.

Legis. Ann., 1965, pp. 46–50).  Similarly, where a corporation is formed artificially in order to

force an individual borrower to waive an otherwise valid usury defense, the New York Court of

Appeals has held that the corporation may raise even the civil usury laws.  *Schneider v. Phelps*,

41 N.Y.2d 238, 239, 242 (1977).  In doing so, it expressly elevated substance over form,

explaining that "[i]f form were to control, the creation of a corporation would, for all practical

purposes, result in a waiver of the right to assert the usury defense," and "[t]he salut[a]ry

commercial purpose of the corporation exemption would be a shield for the loan shark."  *Id.* at

242-43.

---

[3] Notably, the text of the laws does not bar Plaintiff's strategy.  The underlying prohibition on the use of usury laws by corporations states that "[n]o corporation shall hereafter *interpose the defense* of usury in any action."  N.Y. Gen. Oblig. Law § 5–521(1) (emphasis added).  General Obligations Law § 5–521(3) then exempts the criminal usury prohibition contained in Penal Law § 190.40 from this bar, stating that subdivision (1) "shall not apply to any action in which a corporation interposes a defense of criminal usury."  As written, both the bar *and* the exception apply only to defenses, meaning that the plain text permits corporations to assert usury as an affirmative claim.  As a matter of common law, however, New York courts have barred corporations from doing so based on "the principle that a party may not accomplish by indirection what is directly forbidden to it."  *Intima-Eighteen, Inc. v. A.H. Schreiber Co.*, 172 A.D.2d 456, 457 (1st Dep't 1991).  Defendant may not, then, use the plain text of the statute to prove that the criminal usury prohibition cannot be extended in the way that Plaintiff suggests.

Allowing Division 5 to use the criminal usury law to void Fora's UCC liens fits well with this statutory scheme. Division 5 has not sought to invalidate the underlying MCA agreement or to recover already-paid interest. Rather, it wants to protect itself from future efforts to collect an illegal debt through the statutory mechanism of UCC lien letters. While, strictly speaking, a UCC lien is not a legal action, it accomplishes the same end while allowing the issuer to bypass the courts. To condone such practices would create the very kind of loophole that the New York legislature sought to eliminate. Division 5 has therefore at least raised a legitimate question as to whether the Court can issue its requested declaratory judgment.

Next, Fora argues that the MCA agreement is not a loan because it contains a reconciliation provision and lacks a fixed term, and because Division 5 need not pay if it declares bankruptcy. (PI Opp. at 14.) Fora also cites a string of Nassau County Supreme Court cases holding that Fora's standard contract is not a loan. (*Id.*) Such authority is not binding on this Court, and in any event conflicts with the limited precedent available from the Second Circuit and New York appellate courts. As both have made clear, the substance, not the form, of a contract determines whether it is a loan. *Fleetwood Servs.,* 2023 WL 3882697, at *2; *Abir*, 873 N.Y.S.2d at 354. While Fora claims that the contract facially complies with the three-factor test, "the actual operation of the contract[] muddies this picture." *Haymount*, 609 F. Supp. 3d at 248. The reconciliation provision "vests substantial discretion" in the lender, including the ability "to obtain from the merchant further documentation as a procedural pretext for denying reconciliation." *Id.* at 249. Fora also allegedly violated the reconciliation provision by ignoring timely requests and then reverting payments to a higher weekly sum without requesting further reconciliations of its own. (Barker Dec. ¶¶ 7-10.) Moreover, "the daily remittance amounts described in the MCA agreements and alleged to have been negotiated are fixed dollar amounts,

and the Complaint adequately alleges that these amounts appear not to be good faith estimates of the merchant's receivables." *Haymount*, 609 F. Supp. 3d at 249. This is reinforced by the fact that Fora repeatedly returned Division 5's weekly payments to the exact same number at which they started—unlikely the result of a true reconciliation based on actual estimates of receivables. (*See* Transaction History at 2.) Fora also argues that it has no recourse in bankruptcy. But that is not what the agreement says. Rather, the agreement states only that Division 5's "going bankrupt or going out of business, *in and of itself*, does not constitute a breach of this Agreement." (ECF No. 19-2 § 1.1(d) (emphasis added).) The agreement goes on to contemplate Fora's "enforcement of its rights . . . in connection with any bankruptcy proceeding." (*Id.* § 6.2.) It does not, then, clearly grant Division 5 an escape mechanism in bankruptcy. Finally, looking beyond the three factors, there are other indicia that the agreement operates as a loan. Indeed, the agreement even refers to itself as a loan on the first page. (*Id.* at 1 ("Payment is due on the first Tuesday after the Loan Disbursement Amount is disbursed to you.").)

The Court therefore concludes that Division 5 has raised serious questions on the merits.

### C.    Public Interest

Fora does not address the public interest in its opposition brief. In any event, "the public interest is clearly served by enforcing statutes designed to protect the public . . . ." *Stellar Beach*, 2023 WL 4421809, at *3 (quoting by *Google LLC v. Starovikov*, No. 21-CV-10260, 2021 WL 6754263, at *4 (S.D.N.Y. Dec. 16, 2021)). As explained above, New York's usury laws fall into this category. *See supra* § III.B. The public interest factor therefore weighs in Plaintiff's favor.

### D.    Arbitrability

As a final objection, Fora notes that the MCA agreement requires the parties to submit to arbitration, arguing that this counsels against entering a preliminary injunction. But it is well settled in this circuit that "[w]here the parties have agreed to arbitrate a dispute, a district court

has jurisdiction to issue a preliminary injunction to preserve the status quo pending arbitration. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 894-95 (2d Cir. 2015). "Were the Court to decline to consider [the plaintiff's] preliminary-injunction motion pending arbitration, much of the damage that [the plaintiff] seeks to prevent would occur in the time it takes for the arbitrator to be appointed, consider the issues, and deliver a final ruling . . . render[ing] arbitration a hollow formality." *Vortexa Inc. v. Cacioppo*, No. 24-CV-02065, 2024 WL 2979313, at *5 (S.D.N.Y. June 12, 2024) (quotation marks omitted). That said, in the interests of facilitating the arbitration process, should one commence, the preliminary injunction here is subject to later modification or dissolution by a duly appointed arbitrator. (ECF No. 27.)

### E.    Overall Weighing

Because Division 5 has demonstrated irreparable harm, shown serious questions going to the merits and a favorable balance of hardships, and because a preliminary injunction would serve the public interest, the Court grants Division 5's request. The Court will dispose of Fora's parallel motion to compel arbitration and/or dismiss the complaint (ECF No. 15) in due course.

## IV.    Conclusion

For the foregoing reasons, Plaintiff's motion for a preliminary injunction is GRANTED, as set forth at ECF No. 27.

SO ORDERED.

Dated: November 4, 2024
New York, New York

_____
J. PAUL OETKEN
United States District Judge